## Palmer v. White Chapel Gardens, Inc.

*Harold Lockwood, Jr.*, for plaintiff.
*Walter J. Timby*, for defendant.

KELTON, *J.*, November 30, 1983—After jury trial and a verdict of $50,000 in favor of plaintiff, this case is before the undersigned on defendant's post-trial motions. Plaintiff brought actions against defendant cemetery to recover for emotional distress allegedly caused to him by defendant's wanton and reckless misconduct in failing properly to bury, and thereafter to relocate, the body of plaintiff's adoptive mother, Mae Palmer. Other persons and govern-

mental entities were joined as additional defendants and found by the trial judge to be not liable as a matter of law. No issues have been preserved for review as to them.

Three issues have been preserved for review: first, on the motion for judgment n.o.v., whether the evidence was sufficient to permit the jury to find that the cemetery's conduct in losing decedent's body and attempting to find it thereafter was intentional, outrageous or wanton within the meaning of Papieves v. Kelly, 437 Pa. 373, 263 A.2d 118 (1970); whether the $50,000 in damages awarded by the jury was so excessive as to be shocking and to warrant a new trial or remittitur; and finally, whether the trial judge erred in allowing the case to go to the jury without expert opinion testimony causally relating the mental anguish damages of plaintiff to the tortious conduct of defendant. On all of these issues, we find in favor of plaintiff, dismiss defendant's motions and enter judgment on the verdict.

In considering defendant's motion for a judgment n.o.v., we should consider the evidence in the light most favorable to the verdict winning plaintiff and then determine whether defendant's conduct when considered in that light would render it liable under the applicable law. Athens v. Urban Redevelopment Authority of Pittsburgh, 489 Pa. 344, 414 A.2d 100 (1980). Any doubts will be resolved in favor of the verdict. Peair v. Home Assn. of Enola Legion No. 741, 287 Pa. Super. 400, 430 A.2d 665 (1981).

Considering the evidence under that standard, the jury could have found as follows.

Plaintiff is the adopted son and natural grandson of Mae Palmer, decedent. He resided with her for 22 years of his life at her home in Philadelphia. In 1974, decedent became ill and was admitted to the Mount Sinai Nursing Home in Philadelphia. Con-

cerned about her, plaintiff and his family visited her at Mt. Sinai once a week up until November or December, 1977 when she became senile. Thereafter, plaintiff continued sending her letters, cards and gifts on her birthdays and holidays. Plaintiff preserved a fund of money to ensure a decent burial in a family plot in a private cemetery. The jury also could have concluded from the testimony that plaintiff, although not visiting with her personally during her last years, maintained a strong bond of love and affection for her during that time and abandoned his regular visits only because of her deteriorating mental awareness.

Unknown to plaintiff, Mae Palmer was relocated from Mount Sinai to the Mercy Douglas Home in March, 1978 when Mount Sinai was demolished. While there she became ill and later died on December 4, 1979 at the Philadelphia College of Osteopathic Medicine. It was not until May, 1980 that plaintiff learned that Mount Sinai had been destroyed, that decedent had died and that defendant White Chapel Gardens, Inc. had received Mae Palmer's body for burial.

In order to make proper arrangements to have decedent's body disinterred for burial in the family grave plot which had been reserved for her, plaintiff sought and obtained an order from this court to exhume Mrs. Palmer's remains. Defendant then began an extensive search for decedent's body in August, 1980. Digging with a backhoe and shovels in section P-300 of the cemetery where defendant's records indicated decedent *should* have been buried, defendant searched for approximately 15 days without success.

Plaintiff went to the cemetery on three separate occasions and on two occasions observed the actual search. He observed the cemetery employees

digging approximately 20 feet north, south, east and west of the estimated grave site. One female corpse was discovered at this time but it was not that of Mrs. Palmer. After digging to a depth of eight feet, six inches at the estimated grave site, defendant failed to locate Mrs. Palmer's body.

Plaintiff testified that he was left "saddened, depressed, angry and humiliated" by defendant's failure to locate the body and that this whole course of events affected his appetite, left him nauseated, depressed and unable to sleep at night and wondering where his mother's body was located. At trial plaintiff's wife further testified that plaintiff was treated by her brother, a doctor, for recurring nausea and inability to breathe.

In Papieves, supra, 437 Pa. at 376-7, 263 A.2d at 119 (1970), the court held that parents could maintain a cause of action for mental anguish and emotional disturbance caused by a defendant's withholding of the body of their son from them after defendant had struck the son with his automobile and secreted his body without authorization. Basing its holding in part upon Restatement of Torts, §868 (1939), the court held that one who wantonly mistreats, or acting without privilege intentionally withholds, the body of a decedent is liable to a member of decedent's family who is entitled to the disposition of the body.[1] Such a cause of action under the restatement "exists although there has been no harm except such harm to the feeling as is inseparable from the knowledge of defendant's conduct."

---

1. We instructed the jury under this stricter standard of Papieves and Restatement (First) rather than under the looser standard of Restatement (Second) §868 which would permit recovery for ordinary negligence.

Our review of the evidence in the case at bar compels this court to conclude that the jury could have found defendant liable for wanton misconduct under §868 of the original restatement. Defendant avers in his post-trial brief that defendant's conduct does not rise to the level of wanton or shocking mistreatment. However, the jury could have reasonably concluded that decedent was buried at White Chapel Gardens after tranfer there from Hankins Funeral Home, that defendant failed to maintain accurate records of the location of the grave and that the method of searching for the body by digging up 160 square feet with a backhoe was haphazard and shocking. Clearly the jury can be said to have correctly decided that decedent's body was wantonly mishandled in being lost in the first place and may have been wantonly mistreated in its attempted recovery.[2]

The significance attached to the protection, care and sanctity of dead bodies has also been discussed in several lower court opinions in this Commonwealth.[3] A review of the law in other jurisdictions shows that surviving relatives do have a right to recover damages for emotional distress for the mishandling of or interference with dead bodies.[4] We

2. See cemetery employee Brayshaw's testimony.

3. See Wynkoop v. Wynkoop, 42 Pa. 293 (1862); Fox v. Gordon, 16 Phila. 185; Block v. Har Nebo Cemetery Company, 14 D.&C. 237 (1930); Reick v. Maple Hill Cemetery Association, 31 Luz. L. Reg. Rep. 213 (1936); Commonwealth v. Keller, 35 D.&C.2d 615 (1964); Commonwealth v. Browne, 74 D.&C. 724 (1976); Sincovitch v. Peterson, 7 D.&C.3d 371.

4. See Lott v. State, 225 N.Y.S. 2d 434 (1962); Weingast v. State, 254 N.Y.S. 2d 952 (1964); Sanford v. Ware, 191 Va. 43, 60 S.E. 2d 10 (1950); Gostowski v. Roman Catholic Church, 262 N.Y. 320, 186 N. E. 798 (1933); Stephen v. Waits, 53 Ga. App. 44, 184 S.E. 781 (1935); Brownlee v. Pratt, 77 Ohio App. 533, 68 N.E. 2d 798 (1946).

believe the evidence was sufficient to support the verdict.

Next, addressing defendant's motions objecting to the amount of the verdict, for a new trial to be awarded on the basis of an excessive verdict the verdict must be one which shocks the conscience of the the court. Morgan v. Philadelphia Electric Co., 299 Pa. Super. 545, 445 A.2d 1263 (1982). However, our review of the trial transcript reveals that the jury could reasonably have concluded that $50,000 was a fair amount in light of plaintiff's continuing emotional distress.

Defendant argues that because plaintiff did not visit Mae Palmer for three years while she was in a nursing home, his claim of emotional distress over defendant's inability to locate her body is unfounded. We believe, however, that a reasonable jury hearing the evidence could have concluded that plaintiff still cared deeply for his mother. As a result, a verdict of $50,000 was not shocking in light of the ill effects exhibited by plaintiff and his emotional distress over her body never having been identified.

Finally, defendant argues that it was necessary to have medical testimony on the causal relationship between plaintiff's emotional distress and defendant's tortious conduct. The law as to when plaintiff in a personal-injury action must prove causation by expert medical testimony is stated in McArdle v. Panzek, 262 Pa. Super. 88, 396 A.2d 658 (1978). There, quoting Smith v. German, 434 Pa. 47, 50-51, 253 A.2d 107, 109 (1969), the court states:

" 'Where there is no obvious causal relationship, unequivocal *medical* testimony is necessary to establish the causal connection.' . . . But where 'the disability complained of is the natural and probable result of the injuries, the factfinding body may be permitted to so find, even in the absence of expert

opinion.' . . . The two must be 'so closely connected and so readily apparent that a layman could diagnose (except by guessing) the causal connection.' . . . " (Citations omitted.) McArdle 262 Pa. Super. 25, 92-93, 396 A.2d at 660. (Emphasis in original.)

The court in McArdle held that an injured motorist was required to prove by expert medical testimony that a sacroiliac injury was in fact caused by the accident, where the injury did not become symptomatic until two and one-half months after the accident. By contrast, the court in Lattanze v. Silverstrini, 302 Pa. Super. 217, 226, 448 A.2d 605, 609 (1982), held that the jury could determine that there was an obvious causal connection between an auto accident and plaintiff's headache, neck and shoulder spasms, motion limitations in arms, neck and lower back, and a swollen and bruised left knee. The court in Lattanze noted that plaintiff's symptoms manifested themselves the same day within six hours of the initial trauma and were the "immediate and direct" result of defendant's allegedly negligent conduct.

Here, the jury could well have concluded that plaintiff's injuries were the "natural and probable" result of defendant's mishandling of decedent's body. An important factor is the immediacy of the symptoms after the injury. Fenstermaker v. Bodamer, 195 Pa. Super. 436, 171 A.2d 641 (1961) (neck strain suffered immediately after auto accident). Additionally, plaintiff's initial depression over his mother's increasing senility could be distinguished by a jury from the depression caused by defendant's failure to locate her body. More importantly, the jury could easily draw the close connection between loss of appetite, nausea and sleeplessness and defendant's actions. We believe that under the

foregoing principles medical testimony was not essential.

### ORDER

And now, this November 30, 1983, defendant's post-trial motions for judgment n.o.v. and new trial are denied and judgment is entered on the verdict.